Filed 2/28/25  In re A.M. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| In re A.M., a Person Coming Under the Juvenile Court Law. | C101185 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES, | (Super. Ct. No. JD241592) |
| Plaintiff and Respondent, | |
| v. | |
| A.A., | |
| Defendant and Appellant. | |

Mother A.A. (mother) of minor A.M. (the minor) appeals from the juvenile court's orders denying mother's petition for modification in which she sought return of the minor and terminating parental rights and freeing the minor for adoption.  (Welf. & Inst. Code, §§ 366.26, 388, 395; undesignated section references are to the Welfare and Institutions Code.)  Mother contends the juvenile court abused its discretion in denying her petition for modification and erred by failing to find the beneficial parental relationship exception

1

to adoption. She also contends the juvenile court abused its discretion when it denied her request, made after the conclusion of evidence and argument at the section 366.26 hearing, for a bonding study. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Mother was a 16-year-old dependent child of the court and living in a foster care placement when she gave birth to the minor in February 2021. The minor was born prematurely and hospitalized until her discharge on July 2, 2021. Mother was attentive when the minor was first discharged but as weeks passed, mother deferred to the foster parent to provide care for the minor. Mother's foster parent normally cared for the minor during the day while mother attended high school. But mother would otherwise frequently come and go, expecting the foster parent to care for the minor. Mother would also leave for school without feeding the minor before she left, had to be constantly reminded to bathe and feed the minor and to feed her on a regular schedule, and had to be reminded and prompted to talk to and play with the minor. The minor had been born with respiratory distress syndrome and chronic lung disease, weighing 1 pound 12.8 ounces at 26 weeks' gestation. Mother had been instructed to have the minor seen by a lung specialist and follow up with 10 referrals to medical providers, none of which mother did.

On August 31, 2021, mother did not return home from school, leaving the minor in her foster parent's care without making arrangements to do so. This was the second time mother had gone "absent without permission" from her foster placement -- the previous time being the month prior to the minor's birth. Mother's foster parent filed a missing person's report. Mother returned but left placement again two weeks later and thereafter came and went at a Centralized Placement Support Unit (CPSU) while absent without permission from her placement.

2

The minor's father was a non-minor dependent who was on juvenile probation for domestic violence until October 2021.[1] He was supposed to receive anger management and substance abuse services but had failed to complete them.

On September 27, 2021, an incident occurred wherein father was seen yanking mother off the light rail and dragging her by her clothing against her will. Sheriff deputies responded and transported mother back to CPSU. Father was not cited or arrested.

Mother refused to return to her foster parent's home, where the minor was living, even temporarily. CPSU reported that mother was smoking marijuana on the premises and had been under the influence. Mother admitted to the social worker that she smokes marijuana but denied using any other drug or alcohol.

On October 5, 2021, Sacramento County Department of Child, Family and Adult Services (the Department) filed a section 300 petition on behalf of the minor alleging the minor was at risk due to mother's failure to provide adequate care and supervision and due to mother's history of being absent from placement without permission. The juvenile court ordered the minor detained and entered a general visitation order providing mother with a minimum of two, one-hour supervised visits a week.

The contested jurisdiction/disposition hearing took place on December 29, 2021. The juvenile court sustained the petition, declared the minor a dependent child of the court, ordered her removed from parental custody, and ordered reunification services. Mother's services included parenting education, housing assistance, a substance abuse assessment, and substance abuse testing.

In March 2022, the Department reported that, although mother had not completed her other services, she had been visiting the minor twice a week for two hours each visit.

---

[1] Father did not appeal and is discussed for context only.

Mother showed the minor love and affection throughout each visit and did not require significant instruction. In June 2022, the Department reported that mother was living in a foster home and attending high school. She had completed her parenting course. She had also completed her substance abuse assessment. It had been recommended she attend intensive outpatient treatment, but mother had declined. Mother did not attend substance abuse testing until mid-May 2022. She tested positive for marijuana three times and did not appear for the fourth test. Mother's visits had progressed to twice a week for four hours each visit but mother had been struggling to interact with the minor. The visit supervisor reported that mother showered the minor with affection but did not necessarily "engage." Mother was referred to Parent-Child Care to provide her with additional skills training in interacting with the minor. Mother had not started that service.

By July 2022, the Department reported that mother's visits had improved as she had learned how to care for the minor. She took care of the minor's needs and played with her. But the Department was concerned about the interactions between the parents. Mother had arrived at a visit with bruises on her face that she reported were caused by father hitting her. Mother completed an online police report and was referred to WEAVE. Mother was now living with the maternal grandparents. The six-month review hearing took place on July 7, 2022. The juvenile court found mother's progress had been "fair" and continued reunification services and added "domestic violence for victims" to her case plan.

In December 2022, the Department filed a report recommending reunification services be terminated, a section 366.26 selection and implementation hearing be set, and the court pursue a permanent plan of adoption. The minor had been living with her current caregivers since May 12, 2022. Mother was still living with the maternal grandparents, explaining she did not feel ready to live on her own. She was on track to graduate in spring 2023, intending on attending college and working part time at a fast-food restaurant. Mother had been referred in July 2022 to domestic violence counseling

4

through My Sister's House. Mother reported she attended weekly, despite now denying having experienced any domestic violence in her relationship with father. Mother had still not participated in the intensive outpatient treatment recommended in her substance abuse assessment. Mother claimed to have completed a new substance abuse assessment, that she had been referred to Another Choice, Another Chance, and she had been participating in services, but the Department had been unable to verify this information. Since the July 7, 2022 review hearing and through September 22, 2022, mother drug tested negative five times, tested positive for marijuana once, and failed to test seven times. Thereafter, mother's referrals were closed for failure to test. Mother had not tested since August 2022.

Prior to the February 2023 12-month review hearing, the Department and mother reached a resolution in which the Department agreed to extend reunification services for mother. The juvenile court approved of the resolution and mother's reunification services were continued. Father's reunification services were terminated. Mother was advised by the court that if she failed to participate regularly in court-ordered treatment, failed to cooperate, or failed to avail herself of services offered, the consequences may be termination of efforts to reunify the family. The 18-month review hearing was set for April 6, 2023.

In its report filed March 24, 2023, the Department again recommended mother's reunification services be terminated. Mother's goals remained the same. But on February 22, 2023, mother had experienced a domestic violence incident with father. Mother reported father arrived at her home unannounced, took her car keys and parked her car down the street. He then returned to the home where he grabbed her arm and pulled her to the location of the car where he yelled at her about not contacting him. She was able to break free and run back home and lock the doors. Father found a hammer and used it to hit the garage, then walked around the house and attempted to get inside. Mother's sister contacted law enforcement, and mother completed an online application

5

for a restraining order. As of March 24, 2023, she had not received information about the status of her application. Mother was on track to complete the My Sister's House domestic violence course in May 2023. The counselor there reported, however, that mother struggles with consistency, and the program does its best to work with her. There are concerns with her ability to retain information, and the counselor is unsure of mother's level of processing.

Regarding substance abuse, mother had enrolled in a three-month treatment program with Another Choice, Another Chance in September 2022. She had only one more group session to complete before completing a physical exam and discharge appointment. Mother had been directed to complete random weekly drug testing with Bridges Outpatient. She tested one time, on February 14, 2023, after the 12-month review hearing and tested positive for marijuana. Thereafter, mother failed to test.

Mother was authorized to have two, two-hour observed visits per week. Her visits were scheduled on Tuesdays and Thursdays. She attended Thursday visits but was inconsistent with Tuesday visits because she reportedly had difficulty with the 9:00 a.m. visit time after working the late shift at the fast-food restaurant. The Foster Family Agency was unable to staff a change in the visitation time. Mother's visits were a positive experience for mother and the minor. The minor was thriving in her placement, where she had been residing for a year, and the caregivers were willing to provide permanency.

The Department filed an addendum report on May 15, 2023, changing its recommendation from termination of reunification services to the provision of six additional months of services. Mother was attending Tuesday visits but regularly missing her Thursday visits, citing that the 9:00 a.m. visits after working a late shift "[were] a barrier, as well as" the requirement she confirm each visit twice, including confirmation at 8:00 a.m. on the morning of the visit. There were no observed issues during the visits.

6

Mother engaged with the minor, sang, and read to her, and provided snacks and diaper changes.

After several inquiries of mother regarding the status of her restraining order application, mother reported on May 2, 2023, that she had not followed through with processing it and had been advised that father was in jail. Father had asked mother to help him get released on bail; mother declined and terminated the call. The maternal grandmother reported that father had shown up as recently as a week prior and was brandishing a gun. She also reported that father was incarcerated and had asked her for assistance with bail. The social worker followed up with father's reported incarceration and determined that, as of May 9, 2023, he was not incarcerated in the Sacramento County Jail. Father's most recent arrest had been on April 26, 2023, for assault likely to result in great bodily injury and false imprisonment. The social worker also checked with law enforcement about contact involving the maternal grandparents' address. There were calls on April 2 and April 5 regarding father causing disturbances. The Department recommended that mother follow through with obtaining a restraining order and completing a domestic violence victim program.

The Department filed another addendum report on June 6, 2023. Mother had been participating in a domestic violence victim program with My Sister's House. She needed to make up several missed sessions but did not complete them and her referral was ultimately closed. Mother was then referred to WEAVE with specific goals and issues to address. Mother had been unable to complete the restraining order application on her own, so she sought the assistance of her attorney's office and her attorney had just received a copy to review before filing. Mother continued to fail to drug test. Her last test was the positive test in February 2023.

The contested 18-month review hearing took place on June 9, 2023. The juvenile court continued mother's reunification services. It ordered mother to refrain from using marijuana and drug test for four consecutive weeks and gave the Department discretion to

reduce mother's testing if her tests were negative. The court also ordered mother to complete domestic violence services through WEAVE or another Department-approved agency and granted the request for a temporary restraining order against father.

The Department's progress reports reflected that it had submitted new drug testing referrals monthly, but mother had not submitted to any testing. There was a waitlist for WEAVE, so mother was referred to a different program, but she did not participate. WEAVE then scheduled her to start classes in July, but mother would agree to remote only participation, and that service was not offered.

On September 26, 2023, the Department filed a review report recommending mother's reunification services be terminated. Mother was no longer working and now anticipated graduating from high school in December 2023. The Department had discovered she had not worked at the fast-food restaurant since February 2023, although she had continued to cite her work schedule as the reason for her missed visits. Mother had continuously failed to drug test until she finally tested on September 11, 2023, when she tested positive for marijuana. The social worker reported that, on one occasion, in the background of a call to mother, she overheard an unidentified person talking about how high they were.

Mother was authorized one, two-hour observed visit per week. Mother had missed approximately half of her visits, citing either not feeling well or her attempts to fulfill her reunification requirements. The visits she attended went well. Mother had not started domestic violence classes because she said they interfered with her work and school schedule, but she was not yet re-employed. In a November 9, 2023 addendum report, the Department reported it learned mother had started WEAVE services but was terminated for non-participation. Mother had missed two consecutive sessions, which usually results in termination, but the program allowed mother to continue. Mother attended five sessions, but then missed another session and was terminated. The program has 13 sessions.

The contested 24-month permanency review hearing took place on December 1, 2023. Mother testified that she was attending school and began employment at a different fast-food restaurant about a month prior. She claimed she had not smoked marijuana in a year and tested positive because she is around people who smoke, and she cannot control the people using around her. She testified she did not complete the domestic violence course she started at the beginning of the year because, in the February 2023 altercation with father, he had taken her phone, logged her out of all her email and cloud contacts, so she had no way to contact anyone, and was subsequently terminated for failure to attend. The juvenile court found that mother's progress in services had been fair but that she had not visited regularly and had failed to participate regularly and make substantive progress in the court-ordered treatment plan. The juvenile court terminated mother's reunification services and set the section 366.26 hearing for March 25, 2024.

The Department's March 15, 2024 selection and implementation report recommended parental rights be terminated and adoption as the permanent plan. It reported the minor was adoptable due to her young age and overall good health and development, was doing well and was appropriately attached to her current caregivers with whom she had been placed since May 2022, the caregivers were committed to providing permanence for the minor, and there were no barriers to adoption. The report also summarized mother's visitation attendance and noted she had missed half her scheduled visits. It also summarized a recent observed visit at which mother was distracted with her phone much of the time. Based on mother's inconsistent visitation and the recent visit at which mother was not fully engaged with the minor, the Department concluded the minor has a "friendly relationship" with mother and assessed that it would not be detrimental to the minor to terminate parental rights.

Mother filed a section 388 petition for modification on March 22, 2024, requesting return of the minor. As changed circumstances, she alleged she had completed a 15-session domestic violence management course through Stepping Stones to Success and

9

was working with her social worker to obtain independent housing. She alleged it was in the minor's best interests to be raised by her, so the minor could maintain connections with her biological family and cultural heritage.

On March 25, 2024, mother requested a contested selection and implementation hearing. The juvenile court set the hearing on mother's petition for modification to be heard in conjunction with the selection and implementation hearing to commence on May 2, 2024. Prior to the May 2, 2024, hearing, mother requested the juvenile court permit her to introduce the Department's services logs from October 2023 to the present, as well as documentation of her completion of the domestic violence course. The court granted this request.

Mother testified in support of her petition and position opposing termination of parental rights. Testimony from the social worker and the caretaker was also heard. The juvenile court heard argument and then denied mother's section 388 petition. It found it was a "close question" whether mother had established changed circumstances but even if she had, it would still deny the petition because the change was not in the minor's best interests. The juvenile court then heard argument on selection and implementation. Mother argued that the beneficial parental relationship exception applied. At the conclusion of evidence and argument, she suggested the juvenile court could continue the hearing and order a bonding study to assess the parent-child relationship. The Department and minor's counsel opposed the request. The juvenile court declined to continue the matter to obtain a bonding study, concluding that "regardless" of the late request, the study was unlikely "to provide information of sufficient benefit to justify additional delay." It found the minor adoptable, the beneficial parental relationship exception to adoption did not apply and terminated parental rights.

Mother appeals. This matter was fully briefed on December 5, 2024.

DISCUSSION

I

*Petition for Modification*

Mother contends the juvenile court abused its discretion in denying her section 388 petition. We disagree.

Section 388, subdivision (a) provides that a parent of a dependent child may petition the juvenile court "upon grounds of change of circumstance or new evidence . . . for a hearing to change, modify, or set aside any order of court previously made." Section 388 permits modification of a dependency order if a change of circumstance or new evidence is shown and if the proposed modification is in the best interests of the minor. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 526.)

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) The juvenile court looks not to the parent's interests in reunification but to the needs of the child for permanence and stability. (*Ibid.*; *In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) In assessing the petition, the court may consider the entire history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.) " 'A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future point, does not promote stability for the child or the child's best interests.' " (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206.) The child's "best interests are not to further delay permanency and stability in favor of rewarding [the parent] for [his or] her hard work and efforts to reunify." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

The party petitioning for modification has the burden of proof by a preponderance of the evidence of both changed circumstances or new evidence and that the requested

11

order would serve the minor's best interests. (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.) A modification "petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.) We conclude the juvenile court did not abuse its discretion in denying mother's petition.

Mother offered two changes of circumstances in support of her petition: (1) she was working with her social worker to obtain independent housing; and (2) she had completed a 15-session domestic violence management course through Stepping Stones to Success. Neither of these circumstances were established to be a change of circumstance supporting a finding that return of the minor to mother's custody would be in the minor's best interests.

Even by the time of the hearing on the petition -- a month and one-half after it was filed -- mother was still living with the maternal grandparents where she had chosen to live since at least July 2022. She admittedly still had no place to move, so if the court were to return the minor to her physical custody, the minor would be living in the maternal grandparents' home -- a home from which mother had been subject to abuse, witnessed domestic violence, and been removed and placed in foster care.[2] Thus, mother's housing was not a change in circumstances and mother's housing was also a circumstance contrary to the minor's best interests.

Mother's other alleged change of circumstances was her recent completion of the Stepping Stones to Success domestic violence program -- a program unknown to the Department. Mother provided no evidence from counselors or experts to establish she had benefited from the program and mother's testimony relaying what she learned in this

---

[2] Emergency placement of the minor with the maternal grandmother had been declined due to an open child welfare case and a substantiated history of neglect and physical abuse of mother.

program was of little assistance. She could not identify what a "red flag" looks like other than to say it is "what [she] went through in [her] past," like someone "putting his hands on me, controlling." The only other thing she testified she learned was to walk away or stop arguments before they become a "big thing," and separate herself from a "domestic person" by ignoring the person. She testified father continues to try to reach her and her family, but she has been blocking all numbers he has used to try since February 2023 and has told her family to do the same. She has not changed her number to stop his contact because she has had the number for two years. Other than a certificate of completion for a program to which mother was not referred by the Department, there was little evidence of change in circumstances relating to domestic violence.

Finally, mother had not addressed her substance abuse, even though that had been a barrier to returning the minor since disposition. While mother had finally begun to participate in testing, she had tested positive for marijuana (contrary to the court's orders she not use marijuana) on all 15 tests she took. Nonetheless, mother continues to deny using marijuana, claiming the positive test results are a result of secondhand exposure to other's smoke. When asked why she does not protect herself from such exposure when the court had directed her not to be in the presence of people using marijuana, she claimed she could not do so -- yet she claimed she could do so if she had the minor in her custody. The juvenile court could reasonably find that mother's testimony lacked credibility and that mother continues to demonstrate a refusal to comply with court orders, all of which makes return of the minor with supervision inadequate protection for the minor.

For these reasons, the juvenile court did not abuse its discretion in denying mother's petition for modification.

## II

### *Beneficial Parental Relationship Exception*

Mother contends the juvenile court erred by failing to apply the beneficial parental relationship exception to adoption.  We find no error.

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption*.  [Citation.]' [Citations.]  If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.)  There are only limited circumstances that permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).)  One such circumstance is the beneficial parental relationship exception.  (§ 366.26, subd. (c)(1)(B)(i); *In re Caden C.* (2021) 11 Cal.5th 614,  629.)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).)  For the beneficial parental relationship exception to apply, "[t]he parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted.  Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent -- the kind of attachment implying that the child would benefit from continuing the relationship.  And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, at p. 636.)

The beneficial parental relationship exception to adoption "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child

bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576.) The factual predicates of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Id*. at pp. 640-641.)

Here, the juvenile court found that mother maintained consistent visitation with the minor, even though she missed almost half of her scheduled visits. And while the juvenile court found it was a "close call" as to whether the minor's "affectionate and loving relationship" with mother was a substantial positive emotional attachment, it found the second prong had also been met. But the juvenile court did not find evidence that the detriment to the minor of terminating parental rights would outweigh the benefits the minor would gain from adoption. The record supports that lack of finding and its exercise of discretion. Mother did not present sufficient evidence that her relationship with the minor was so significant that severance of the relationship would greatly harm the minor to the point of outweighing the benefits of adoption. (Cf. *In re Caden C.*, *supra*, 11 Cal.5th at pp. 636-637.)

At the time of the May 2024 selection and implementation hearing, the minor was three years and two months old, yet she had spent very little time in mother's care. She was not discharged from the hospital until she was four and one-half months old and, once discharged, it was mother's foster mother who provided much of the care for the minor. Less than two months later, mother left the foster placement, leaving the minor in the foster mother's care, and since has not cared for the minor outside of scheduled visitation.

15

Although authorized to visit more often, mother generally visited the minor about once a week. The visits were positive and appropriate, and the minor appeared to be excited for and enjoy the visits. The minor would hug mother but was reported to be very affectionate and hug almost everyone, including the maternal grandmother, the social worker, and the family service worker. Although the reports showed the visits went well, there were also reports that, recently, the minor would become fussy and clingy to her caregivers after the visits. If she were sent to daycare after visits, she would not want to play. The minor would appear sad and just want to be held and hugged by the caregiver. At night, the minor would normally say she is sleepy and ready for bed. But after visits with mother, she would be very clingy and want the caregivers to stay with her in her room. Thus, while the minor had formed an attachment to mother, maintaining her relationship with mother was having behavioral changes as well. And mother presented no evidence of detriment in severing the attachment beyond that inherent in any termination of parental rights. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575 [interaction between natural parent and child will almost always confer some incidental benefit to the child].)

" 'The best interest of the child is the fundamental goal of the juvenile dependency system, underlying . . . child safety, family preservation, and timely permanency and stability.' [Citation.] ' " 'Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' " ' [Citation.] Stability and continuity of care are primary considerations in determining the child's best interest." (*In re J.M.* (2020) 44 Cal.App.5th 707, 718.) The young minor here has spent nearly all of her life in foster care. While she has been in her current placement since May 12, 2022, she was subjected to substantial instability beforehand. She spent the first four and one-half months of her life in the hospital; the next two months in mother and mother's foster mother's care; and after August 2021, in mother's foster mother's sole care. The minor was placed into protective custody in October 2021 in what appears to be a different resource family

16

home, and then (due to that placement's noncompliance with visitation) transitioned to her current placement in May 2022.

The juvenile court could reasonably find that foregoing stability and permanence in favor of a tenuous placement to provide an opportunity for continued contact with mother would not be in the minor's best interests. In light of the minor's very young age, the limited portion of her life spent in mother's care, the negative effects mother's visits have on the minor even though she enjoys the visits themselves, and the minor's need for stability as well as the stability the minor was enjoying in her caregivers' home, there was insufficient evidence demonstrating the minor would suffer detriment from the loss of a significant bond if parental rights were terminated that would outweigh the benefits of permanency. There was no error in the juvenile court's finding that the beneficial parental relationship exception did not apply.

III

*Bonding Study Request*

Finally, mother contends the juvenile court abused its discretion in denying her request for a bonding study -- a request she did not make until her closing argument regarding the application of the beneficial parental relationship exception to adoption. We review the denial of a request for a bonding study for abuse of discretion. (*In re P.S.* (2024) 107 Cal.App.5th 541, 553; see also *In re Richard C.* (1998) 68 Cal.App.4th 1191, 1195, 1197.) We find no abuse of discretion in the juvenile court's denial of the request as untimely and/or unnecessary.

Under Evidence Code section 730, a court *may* appoint an expert to study the bond between a parent and a child. (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084.) "There is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to" terminating parental rights. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339.) The juvenile court has broad discretion on whether to order a bonding study. (*Id.* at pp. 1339-1340.) On review, we determine "whether, under all

17

the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study." (*Id.* at p. 1341.)

In *Richard C.*, the mother requested a bonding study after the section 366.26 report had been prepared, arguing that due process required the court to allow a neutral expert to assess the mother's bond with her children. (*In re Richard C.*, *supra*, 68 Cal.App.4th at pp. 1194-1195.) In affirming the denial of the request, the appellate court noted that the mother's request was untimely because it came after family reunification services had been terminated. (*Id.* at p. 1194.) At that late stage in the proceedings, " 'the focus shifts from the parent's interest in reunification to the child's interest in permanency and stability.' " (*Id*. at p. 1195.) The court reasoned that allowing bonding studies "after the termination of reunification services would frequently require delays in permanency planning," and that the "Legislature did not contemplate such last-minute efforts to put off permanent placement." (*Id.* at p. 1197.) Though "it is not beyond the juvenile court's discretion to order a bonding study late in the process under compelling circumstances, the denial of a belated request for such a study is fully consistent with the scheme of the dependency statutes, and with due process." (*Ibid*.)

Consistent with *Richard C.*, the juvenile court here did not err in denying mother's last-minute request for a bonding study that was requested after the close of evidence during the conclusion of her argument regarding the application of the beneficial parental relationship exception to adoption. "[B]onding studies after the termination of reunification services" already "frequently require delays in permanency planning." (*In re Richard C.*, *supra*, 68 Cal.App.4th at p. 1197.) The timing of mother's request is of particular concern because the study would have necessitated a last-minute and substantial continuance of the section 366.26 hearing.

Continuances are disfavored in dependency cases, especially, as is the case here, when they infringe on maximum statutory time limits. (§§ 352, subds. (a), (b); 366.25, subd. (a)(3) [§ 366.26 hearing to be held no later than 120 days from date of review

18

hearing at which it is set]; *In re David H.* (2008) 165 Cal.App.4th 1626, 1635.) A continuance shall be granted only upon a showing of good cause and shall not be granted if to do so would be contrary to the minor's interests, giving "substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (§ 352, subd. (a)(1) & (2).)

While mother posited that the delay that would be necessary to obtain a bonding study in this case was inconsequential because the minor's placement was secure, this very young minor had been in foster care for almost two and one-half years and reunification services had been terminated over five months prior. Further delay was contrary to the minor's interest in a prompt resolution of her custody status.

Mother did not provide a valid reason why she could not have made her request much earlier. "The kind of parent-child bond the court may rely on to avoid termination of parental rights . . . does not arise in the short period between the termination of services and the section 366.26 hearing." (*In re Richard C.*, *supra*, 68 Cal.App.4th at p. 1196.) Indeed, as early as the October 2021 jurisdiction/disposition report, the Department reported the minor's caregiver was willing to provide permanency through adoption should reunification efforts fail. When the Department filed its 12-month review report in December 2022, it recommended termination of reunification services and pursing adoption as the permanent plan. Although it later revised its recommendation to allow for additional services, the December 2022 recommendation put mother on notice that adoption may be the permanent plan if reunification efforts failed.

The reason mother gave the juvenile court for requesting the study was to have "a professional" more fully assess the parent-child relationship, which mother opined "was not reasonably analyzed in the report for the hearing." Yet mother provided no explanation as to why she had not made the request for a bonding study promptly after

that March 15, 2024 selection and implementation report had been filed.  The Department expressly recommended termination of parental rights and adoption as the permanent plan in its March 15, 2024 selection and implementation report -- placing mother on notice that the Department was considering adoption as a permanent plan.  The Department's analysis supporting its recommendation was included in its report.  Nonetheless, mother did not make her request for a bonding study until two months later, after the close of evidence at the selection and implementation hearing, at the end of her closing argument.  Her delay was inexcusable.  The juvenile court reasonably concluded that good cause had not been established and that a continuance was contrary to the goals of stability and permanence for the minor after termination of reunification services.  (See *In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317 [following termination of reunification services, focus shifts to child's need for permanency and stability].)

Moreover, the juvenile court expressly noted that the evidence in this case included the delivered service logs.  The juvenile court found these logs to be of particular importance, noting that the logs contained information that was not in the Department's report, and to some extent contradicted it, and that the logs reflected the quality of mother's visits with the minor, as well as the minor's attachment to mother.  Thus, even in the absence of a bonding study, there was additional evidence, beyond that in the report, to allow the court to assess the parent-child relationship.

For these reasons, the juvenile court did not abuse its discretion in denying mother's request for a bonding study.

DISPOSITION

The juvenile court's orders are affirmed.

_/s/_____
Mesiwala, J.

We concur:

_/s/_____
Duarte, Acting P. J.

_/s/_____
Feinberg, J.